THE PEOPLE OF THE STATE OF NEW YORK, Plaintiff, *v.* JAMES W. HIGGINS and Others, Defendants.

In the Matter of Proceedings to Punish MILSOM M. BASSETT and Others for Criminal Contempt of Court.

Supreme Court, Erie County, November 22, 1939.

*Frank G. Raichle, Special Prosecutor*, for the People.

*William B. Mahoney*, for the defendants Milsom M. Bassett and John J. Pensky.

*Eugene V. Hanavan*, for the defendant Robert E. Whiteside.

*Edward J. Culligan*, for the defendant John J. Gorman.

CONWAY, J. The alleged contemnors, Bassett, Whiteside, Gorman and Pensky, are charged with criminal contempt under subdivision 3 of section 750 of the Judiciary Law. In addition the alleged contemnor Gorman is charged with violation of subdivision 1.

Subdivision 3 gives a court of record power to punish for a criminal contempt a person guilty of willful disobedience to its lawful mandate. In this instance the lawful mandate was the admonition required by section 415 of the Code of Criminal Procedure. That section reads as follows: " The jury must also, at each adjournment of the court, whether permitted to separate or kept in charge of officers, be admonished by the court, that it is their duty not to converse among themselves on any subject connected with the trial, or to form or express any opinion thereon, until the cause is finally submitted to them."

In the case of People v. Higgins *et al.*, in which the alleged contemnors sat as jurors, this admonition was given at each adjournment as commanded by the Legislature. Not only was

the admonition given, but the court in addition sought to explain the reason for the legislative command. For instance, on September twenty-second, before counsel opened to the jury, at the time of taking the noon adjournment, the court admonished the jury as follows: " Now, again, you are going to lunch and I instruct you, as I am required to do by statute, not to discuss this case among yourselves, or with anyone else, or to form or express any opinion about it until it is finally submitted to you, and that means at the conclusion of all the evidence or the testimony, and after the charge of the court."

On the same day, when the court adjourned in the afternoon until the following morning, the court admonished the jury as follows: " Do not discuss the case now with anyone or form or express any opinion about it until it is finally submitted to you. You will find that making up your mind on anything until all the evidence is before you is not conducive to the arrival at the proper conclusion. So wait until you hear all the case and until you hear my charge."

At an adjournment on September 26, 1939, the court admonished the jury as follows: " Members of the jury, do not discuss the case among yourselves, nor with anyone else, nor form nor express an opinion about it until it is finally submitted to you. I have to tell you that each time we separate and you leave this court room, so you see how important the law thinks it to be, when I am required by the Legislature to say that to you every time you go from this court, so bear it in mind."

On October 2, 1939, at the evening adjournment, the court said: " I will adjourn until tomorrow at 10 o'clock, and say again to you, as the Legislature requires me to, do not discuss the case among yourselves, nor with anyone else, nor form nor express an opinion about it until the case is finally submitted. You can see how important it is to keep your minds open when I am obliged under the law to say that to you every time we separate."

On October 4, 1939, at the noonday adjournment, the court admonished the jury as follows: " Do not discuss the case amongst yourselves, nor with anyone else, nor form or express any opinion about it until the case is finally submitted to you. That probably becomes monotonous but, as I pointed out to you before, it is because that is very important and the Legislature commands, that I say it to you every time you leave the court room."

The testimony establishes to my satisfaction beyond a reasonable doubt that the alleged contemnor Bassett contacted various jurors serving with him, before the final submission of the case, for the purpose of affecting their verdict by expressing an opinion as to

the innocence of the defendants on trial. When the jurors so contacted failed or declined to enter into a discussion of the defendants' innocence, Bassett desisted in his attempts to so influence them, but continued as to the other jurors. The continuance of his endeavors indicates deliberateness and willfulness in disobeying the lawful mandate of the court. I shall refer to some of the testimony adduced on the hearing by the special assistant district attorney.

One Thomas B. Rogers, one of the jurors, testified that on Thursday or Friday night of the week preceding the Tuesday on which the trial ended, about ten o'clock in the evening, the alleged contemnors Bassett, Whiteside, Gorman and Pensky came to his room where he was reclining on his bed; that they came to the side of his bed and Bassett asked him " would he go along with him on a quick acquittal of the whole gang;" that as to the other three men who were present Bassett said, " They are with me;" that Bassett said that he wanted Rogers to go along with him and the other three for a quick acquittal of the whole gang; that Bassett said, " We are going to make it in seven minutes, no longer." Rogers testified that he said in reply that he had to hear the judge's charge, and that he said, " I am not interested in what you fellows want to do, absolutely."

While it is true that Rogers testified that he did not remember a word the others said, if anything, it, nevertheless, is clear that the three with Bassett were aiding and assisting by their presence in the willful disobedience by Bassett of the mandate of the court, and I so find.

Another juror, John L. Fassett, testified that Bassett once or twice whispered on the side to him that there was nothing to the case or the evidence, some time in the second week of the trial, in the hall of the Statler Hotel where the jury had their rooms; that Bassett said they had no evidence against the defendants; that it was rotten; that Bassett said the defendants would be acquitted in a short space of time, probably half an hour.

Another juror, George J. Glauber, testified that he was the foreman on the conspiracy trial and that Bassett was his room mate; that Bassett spoke to him about the case during the progress of the trial; that that was probably during the first week of the trial; that it was just an inquiry about what he thought about the case or what his opinion was; that it was while they were walking from the court to the dining room of the Statler Hotel. The witness said that he told Bassett that they would have to wait until all the facts were in to determine just exactly " what was what." He said that Bassett brought the subject up again probably two or

three times; that on such occasions Bassett would say, " Well, what do you think about it? " or, " What is your opinion? "

Another juror, Norbert Gramse, testified that on one occasion Bassett spoke to him about the case; that that was when the witness walked down either to Whiteside's room or to Bassett's room; that it was some time during the first half of the case that Bassett asked how the witness felt about the trial; that when the witness said he had not heard it all and had not reached any conclusion, Bassett said, " I don't know how there could be a conviction of guilty."

The special assistant district attorney called Mrs. Thelma Dauberger, a deputy sheriff assigned to service with the jury. She testified that the jury had its meals at the Buffalo Athletic Club; that in the dining room Mr. Glauber sat on her right during meals and Bassett on her left, with Mrs. Muscarella, another juror, on the other side of Bassett; that it was a large, round table, and that the male deputy sheriffs sat at the same table. She was asked: " Did there come a time when you heard Mr. Bassett say something about the case? A. I never heard him discuss the case. Q. Did you hear him express an opinion about it? A. He just said, ' Cheer up, it won't be long now.' Q. Now can you give us his exact words? A. Well, that is about all he said." Then followed the following remarkable testimony by the witness: " Q. Were you asked this question in the Grand Jury on the subject, page 54: ' What did he say,' referring to Mr. Bassett? ' Well, he said he didn't think it was going to take long after the summation.' Did he say that or did you say that in the Grand Jury? A. I didn't say that, no, sir. Q. Well, Mrs. Dauberger, search your recollection and see if you didn't —— A. May I have the question again? [Question read.] A. I said that. Q. Is that the truth? A. Yes, sir. Q. Is that what he said? A. He said ' Cheer up, it won't be long now.' By the Court: Q. Is that what he said, Madam? A. Yes, sir. Q. You are a public official? A. Yes, sir. Q. You understand the question? A. Yes, sir. Q. Is that what he said? A. Yes, sir. Q. Did you forget that a few minutes ago? A. No, sir. Q. What? A. No, sir. By Mr. Raichle: Q. Did he say to the jury that it wouldn't take long to decide this case? [Objection was made and overruled.] A. I didn't hear any. Q. Were you asked this question in the Grand Jury, .' In other words, he made the statement in your hearing it wouldn't take long to decide the case? ' and did you say, ' That is right? ' "

Then objection was made and overruled, and then the question asked: " Q. Was that question asked of you and did you make that answer? A. Yes, sir. Q. Then were you asked this question: ' Q. Who did he say it to? A. I think everybody in general.' "

Objection was then made and the question read as follows: " Were you asked this question in the Grand Jury, ' In other words, he made the statement in your hearing it wouldn't take long to decide the case,' and did you say, ' That is right?' ' "

After an objection the witness was directed to answer the question as read by the court reporter. " The Witness: What is it? [The question was again read by the court reporter.] A. He said, ' Cheer up, it won't be long.' The Court: No, Madam. Please answer the question. Read it, Mr. Stenographer. [The question was then read as follows: ' Were you asked this question in the Grand Jury, " In other words, he made the statement in your hearing it wouldn't take long to decide the case," and did you say, " That is right? " '] The Witness: Yes. Q. I am sorry, I cannot hear you. A. Yes, sir. Q. Is that the truth as to what he said? A. Yes, sir. "

Objection was again made and overruled and the court asked: " Was your answer in the Grand Jury room true? The Witness: Yes." Then, after objections and colloquy the witness was asked by the court: " Q. When you say you thought he said it to everybody in general, do you recall that answer in the Grand Jury room? A. Yes, everybody in general."

The witness was then asked as to the tone of voice in which Bassett had made the statement, and the witness testified that it was in about the tone in which she was talking. The witness was asked: " Q. Then did one or more deputies speak up and admonish him not to talk in that fashion? A. I don't remember. Q. Well, were you asked this question in the Grand Jury, Mrs. Dauberger, at page 57: ' Anybody tell him not to talk in that fashion? ' and did you make the answer, ' That is right?' A. Yes, sir. Q. Is that what happened? A. Somebody mentioned something about the case shouldn't be discussed. Q. Well, did one of the deputies admonish him? A. I don't know which one. Q. Well, did one of them? Is it your recollection it was a deputy who admonished him? A. Yes, sir. Q. What did he say when he was told to stop talking, referring to Mr. Bassett? A. Nothing."

While, quite evidently, the witness was attempting to withhold testimony which, as an officer of the court, she was in duty bound to furnish, it is clear from her testimony that the alleged contemnor Bassett was pursuing his continued attempts to influence the minds of the jurors so as to bring about an acquittal and was willfully disobeying the mandate of the court. Apparently after testifying in the grand jury room the witness had determined that all she would remember was that Bassett said, " Cheer up, it won't be

long now," regardless of what in truth and fact had taken place during her service as a sworn officer of the court.

Another deputy sheriff, Mrs. Rose Banas, testified that sometimes at meals she sat alongside of Bassett; that Bassett said at the dinner table that he did not think the seven defendants were guilty; that that was during the early part of the trial; that she said nothing and that she just took it as a joke; that she did not believe any one else heard it; that Mrs. Muscarella was right there, but that she did not think she heard it.

When she was cross-examined she testified that Bassett whispered it to her.

Mrs. Straker, another deputy sheriff, testified that Bassett spoke to her about the case in the recreation room on a Saturday when the lawyers were arguing motions in court; that it was about a week before the prosecution rested its case; that she came into the recreation room and said to Bassett, " You are still here, aren't you? " that Basset laughed and said, " Yes, but I will bet you that the judge will dismiss the case;" and that Bassett said he would bet any money the judge would either dismiss the case or throw it out; that she just took it as a joke.

Bassett testified in his own behalf but was not a believable witness. Neither was Whiteside nor Gorman. Pensky did not take the stand in his own behalf.

I would not adjudge any of these defendants guilty of criminal contempt because of a mere casual reference to the testimony of a witness or witnesses during the trial and before the case was finally submitted. While, strictly speaking, that would be disobedience to the instructions of the court given under section 415 of the Code of Criminal Procedure, nevertheless, some comment might be natural. For instance, a juror might very well say to his fellow jurors during a recess that a witness who had just been examined appeared to be a truthful witness or an untruthful one. This and similar casual comment, it seems to me, might be natural conduct on the part of a juror for which he should not be punished.

The charge here is a very different one. Here it is charged that Bassett, Whiteside, Gorman and Pensky sought, while the trial was proceeding, to induce another juryman to agree to an acquittal and further to render a verdict of acquittal within a given period, namely, seven minutes; it is further charged that Bassett sought to influence other jurymen for acquittal and endeavored to put in the mind of the juror Fassett that the defendants should be acquitted in a short space of time, namely, half an hour. It is curious that Bassett should have been so anxious for speed, returning to it on at least two occasions, whether or not it was self-inspired.

Bassett was the moving spirit in the misconduct of the alleged contemnors. The others followed and fell in with his plans. They have not the education or ability of Bassett.

I adjudge the four alleged contemnors guilty of contempt of court as charged under subdivision 3 of section 750 of the Judiciary Law. (*Matter of Driscoll*, 203 App. Div. 870; *People ex rel. Munsell v. Court of Oyer & Terminer*, 36 Hun, 277, 285; affd., 101 N. Y. 245; *Rozean v. State*, 109 Neb. 354; 191 N. W. 319.)

Mr. Justice CROPSEY in his unpublished opinion below in *Matter of Driscoll* (*supra*), a companion case to *Matter of Cochran* (237 N. Y. 336), said:

" At each adjournment of the court the justice gave the jury the statutory instruction not to talk about the case among themselves until it was finally submitted for decision, and special emphasis was laid upon this injunction. Notwithstanding Driscoll, in violation of the court's order, did, during the trial and before the final submission of the case, speak to another juror asking him how he stood on the proposition, saying that Plant was a good fellow and that there was more in the case than appeared on the surface, that there was a whole lot of politics in it. * * *

" The conduct of these two jurors plainly constitutes criminal contempt under section 750 of the Judiciary Law. The disregard of the court's order by Driscoll in speaking to one of the jurors about the case constituted a contempt. (*People ex rel. Munsell v. Court of Oyer & Terminer*, 101 N. Y. 245, 252.) "

In the *Munsell* case (*supra*) the presiding justice in a concurring opinion said: " Section 415 of the Code of Criminal Procedure requires that the court shall direct the jury at the time of each adjournment during the trial that it is their duty not to converse among themselves on any subject connected with the trial, or to form or express any opinion thereon until the case is finally submitted to them. I entertain no doubt whatever that such an instruction is a ' Lawful mandate,' to be obeyed as such by each one of the jurors, and that its willful disobedience may be punished as a criminal contempt when properly proven before the court."

In addition, as to Gorman there is the charge that he knew one of the defendants on trial but failed to disclose that fact when inquiry was made; that when he was asked before being accepted as a juror whether he knew any of the defendants, he said, " No," although in truth and fact he knew the defendant Matthew Dwyer.

Mr. James O. Moore, Jr., assistant to the special assistant district attorney, testified that on the 9th of November, 1939, Gorman admitted that before the conspiracy trial he had seen Matt Dwyer in various bookmaking establishments, and that he knew Dwyer by reputation to be a bookmaker prior to the date of that trial.

Charles Wilson testified that he had known Gorman all his life; that he had gone with Gorman to the South Buffalo Club about ten times in the year 1937; that at times he saw Dwyer there; that the South Buffalo Club was located on Abbott road near Triangle street; that there was a cage on the premises and sheets on the wall; that at times he saw Dwyer back of the cage; that he saw Dwyer taking bets on horses; that Gorman was with him on occasions when he placed bets with Dwyer; that he and Gorman went into the place together at times; that he did not remember seeing Gorman make bets with Dwyer; that he and Gorman went to the South Buffalo Club over a period of several months in 1937; that Matt Dwyer was on the premises most of the time when he was there; that he saw Dwyer in the South Buffalo Club about eight times when he was there with Gorman; that he did not know whether Dwyer was an employee of the South Buffalo Club or operated the place; that there were apparently six or eight people working there and one of them was Dwyer.

I adjudge Gorman guilty of criminal contempt on this phase of the hearing under subdivision 1 of section 750 of the Judiciary Law, in that his conduct and behavior were such as directly tended to impair the respect due to the authority of the court. (*Clark* v. *United States*, 289 U. S. 1.)

There the court, in an opinion delivered by Mr. Justice CARDOZO, said:

" Concealment or misstatement by a juror upon a *voir dire* examination is punishable as a contempt if its tendency and design are to obstruct the processes of justice.    *    *    *

" ' An obstruction to the performance of judicial duty resulting from an act done in the presence of the court is    *    *    *    the characteristic upon which the power to punish for contempt must rest.' WHITE, C. J., in *Ex parte Hudgings*, 249 U. S. 378, 383. The petitioner is not condemned for concealment, though concealment has been proved. She is not condemned for false swearing though false swearing has been proved. She is condemned for that she made use of false swearing and concealment as the means whereby to accomplish her acceptance as a juror, and under cover of that relation to obstruct the course of justice. There is a distinction not to be ignored between deceit by a witness and deceit by a talesman. A talesman when accepted as a juror becomes a part or member of the court. *In re Savin*, 131 U. S. 267; *United States* v. *Dachis*, 36 F. (2d) 601. The judge who examines on the *voir dire* is engaged in the process of organizing the court. If the answers to the questions are wilfully evasive or knowingly untrue, the talesman, when accepted, is a juror in name only. His relation

to the court and to the parties is tainted in its origin; it is a mere pretense and sham. What was sought to be attained was the choice of an impartial arbiter. What happened was the intrusion of a partisan defender. If a kinsman of one of the litigants had gone into the jury room disguised as the complaisant juror, the effect would have been no different. The doom of mere sterility was on the trial from the beginning."

In *People ex rel. Nunns* v. *County Court* (188 App. Div. 424, 439), in an opinion delivered by Presiding Justice JENKS, the court said: " And first as to the behavior under examination as a juror. Indifference is an element of a jury. (*Capital Traction Co.* v. *Hof*, 174 U. S. 15.) Our statute prescribes it. (Code Crim. Proc. § 387.) To that end is the right of challenge and with it the right of examination. In the case whence this proceeding arose, the counsel in charge of the prosecution declared to the relator after he was drawn as a juror, that the People desired an indifferent jury (as was their right), which was sought in a jury of those who did not know the defendants or their place then charged as disorderly. Thus the officer charged by law in the first instance to see that a jury was satisfactory to the People, had informed the relator of an objectionable feature as far as the People were concerned in any man proposed as juryman in that case. If the relator did know the defendants and their place, he had fair notice that he was objectionable from the viewpoint of the People. He was chargeable with notice that his avowal of such knowledge might prompt further questions aimed towards bias, or subject him to a challenge peremptory; on the other hand, his disclaimer of such knowledge would naturally satisfy his examiner as to any objection founded upon that knowledge. If the relator appeared as of the first twelve persons approved as indifferent, he must be sworn. (Code Crim. Proc. § 387.) This falsehood of the relator represented him as an indifferent juror, so far as a test applied by the People was concerned. And so far this falsehood tended to impede or to frustrate the administration of justice, to violate the rights of the People as represented in their legal tribunal that was to be constituted by a judge and twelve *indifferent* jurors. This falsehood was uttered during the sitting of the court and in its immediate view or presence. And I think that such behavior was within the statutory words ' tending * * * to impair the respect due to its authority.' The authority of the court is the official power of the court. (Anderson's Law. Dict. ' Authority.') The official power of the court was to try the indictment with a jury. The securing of the jury prescribed by law was within the authority committed by law to the court in the last instance, and was within its supervision. And this was a

falsehood by a proposed juror, conscious that the purpose of the inquiry was as to his indifference, whereby he impaired the respect due to the court which required the truth."

*Matter of Cochran* (237 N. Y. 336) does not impair the authority of the *People ex rel. Nunns* case (*supra*) on this point. (See *Clark v. United States,* 61 F. [2d] 695, 706, 707.)

The misconduct of the contemnors is especially to be condemned. In a civil trial, or if the defendants had been convicted, the evil wrought could be remedied by the granting of a new trial. In the present situation, that remedy may not be applied. The seven defendants in the conspiracy trial having once been put in jeopardy of a conviction of crime and of loss of liberty, may not be tried again.