[No. AO17704. First Dist., Div. Two. June 14, 1983.]

CAROLYN BOBB, Plaintiff and Appellant, v.
THE MUNICIPAL COURT FOR THE MONTEREY COUNTY JUDICIAL
DISTRICT OF MONTEREY COUNTY, Defendant and Respondent;
THE PEOPLE, Real Party in Interest and Respondent.

COUNSEL

Katherine E. Stoner, Margaret C. Crosby, Alan L. Schlosser and Amitai Schwartz for Plaintiff and Appellant.

No appearance for Defendant and Respondent.

Ralph R. Kuchler, County Counsel, and W. Allen Bidwell, Deputy County Counsel, for Real Party in Interest and Respondent.

OPINION

MILLER, J.—Carolyn Bobb appeals from the superior court's judgment denying her petition for writ of certiorari and affirming respondent court's judgment of contempt.

The facts of this case are not in dispute. On January 26, 1982, appellant, an attorney, was called and appeared for jury duty on a criminal case in municipal court. When appellant was called to take her place in the jury box as a prospective juror the following voir dire examination was conducted by the trial judge:

"THE COURT: Miss Bobb, what is your occupation?

"MISS BOBB: I'm an attorney.

"THE COURT: And in your practice do you practice criminal law as well as civil law?

"MISS BOBB: No, I practice entirely bankruptcy law.

"THE COURT: All right. Is there a Mr. Bobb?

"MISS BOBB: I have some difficulty with that question because I've noticed only the women have been asked to answer that.

"THE COURT: Yes, I know. Do you have a Mr. Bobb—is there a Mr. Bobb?

"MISS BOBB: Are you going to pool [sic] the men to see if they care to disclose—

"THE COURT: No, I'm just going to ask you if you have a husband or not. Do you have a husband?

"MISS BOBB: I don't care to answer it then. What's relative to women is relative to men.

"THE COURT: Yes, I know. What is your husband's occupation?

"MISS BOBB: I don't care to answer that.

"THE COURT: I instruct you to answer.

"MISS BOBB: I don't think I should.

"THE COURT: I've got—you understand that you'll be in contempt of Court—jury—you're an attorney, you understand these rules, don't you?

"MISS BOBB: No, I do not understand why only the women are asked certain questions and the men aren't asked the same questions.

"THE COURT: The question to you, Mrs. Bobb—you're an attorney at law, you understand the rules and regulations of—of—of being an attorney. And the question to you now simply is: What is your husband's occupation?

"MISS BOBB: I refuse to answer.

"THE COURT: You're held in contempt of Court, Mrs. Bobb."

Immediately thereafter appellant was taken to a holding facility to await transfer to the county jail. After spending approximately 15 minutes at the holding facility, appellant was ordered released on her own recognizance on condition that she return at 3 p.m. that afternoon for sentencing by respondent court.

At the sentencing hearing appellant requested a continuance in order to obtain counsel and to do further research. The court denied the continuance. After appellant further explained her objection to the voir dire questioning, the court acknowledged her sincerity but repeated its conviction that the questions posed were valid and that refusal to answer them constituted contempt of court. Appellant was then sentenced to one day in jail, with credit for her time served.

Appellant petitioned the superior court for a writ of certiorari requesting that the orders made by respondent court be annulled and set aside. The superior court affirmed respondent court's judgment of contempt finding that the cases cited by appellant regarding the United States and California Constitutions' prohibition against racial discrimination did not apply to the facts in the present action.

██ On appeal appellant concedes that the questions put to her, when administered in a gender-neutral context, were constitutionally valid. However, she contends that when the questions are posed as part of a discriminatory pattern they constitute a denial of equal protection. (*Yick Wo* v. *Hopkins* (1886) 118 U.S. 356 [30 L.Ed.2d 220, 6 S.Ct. 1064].)

Citing *Hamilton* v. *Alabama* (1964) 376 U.S. 650 [11 L.Ed.2d 979, 84 S.Ct. 982], *Johnson* v. *Virginia* (1963) 373 U.S. 61 [10 L.Ed.2d 195, 83 S.Ct. 1053] and *In re Berry* (1968) 68 Cal.2d 137 [65 Cal.Rptr. 273, 436 P.2d 273], appellant maintains that a court which issues an unconstitutional order acts in excess of its jurisdiction and, accordingly, there is no contempt of court on the part of one who refuses to obey such an order. The facts in *Hamilton* are the most analogous to the instant action.

In *Hamilton* a black woman who was called as a witness refused to answer questions on cross-examination so long as she was referred to as "Mary" instead of "Mrs. Hamilton."[1] The trial court held her in contempt of court. However, the contempt conviction was annulled per curiam by the United States Supreme Court. Although the Monterey Superior Court found *Hamilton* and appellant's other cited cases inapposite to the present action, it appears that the cases are directly on point.

██ Equal protection provisions of the California Constitution "while 'substantially the equivalent of' the guarantees contained in the Fourteenth Amendment to the United States Constitution, are possessed of an independent vitality which, in a given case, may demand an analysis different from that which would obtain if only the federal standard were applicable." (*Serrano* v. *Priest* (1976) 18 Cal.3d 728, 764 [135 Cal.Rptr. 345, 557 P.2d 929].) It can be seen that this state has applied a standard of review different from that applied

---

[1]The *Hamilton* record was quoted in *Bell* v. *Maryland* (1964) 378 U.S. 226, 248-249, footnote 4 [12 L.Ed.2d 822, 871, 84 S.Ct. 1814]:
" 'Cross examination by Solicitor Rayburn:
" 'Q. What is your name, please?
" 'A. Miss Mary Hamilton.
" 'Q. Mary, I believe—you were arrested—who were you arrested by?
" 'A. My name is Miss Hamilton. Please address me correctly.
" 'Q. Who were you arrested by, Mary?
" 'A. I will not answer a question—
" 'By Attorney Amaker: The witness's name is Miss Hamilton.
" 'A. —your question until I am addressed correctly.
" 'The Court: Answer the question.
" 'The Witness: I will not answer them unless I am addressed correctly.
" 'The Court: You are in contempt of court—
" 'Attorney Conley: Your Honor—your Honor,
" 'The Court: You are in contempt of this court, and you are sentenced to five days in jail and a fifty dollar fine.' "
Justice Douglas characterized this exchange as one of the " 'relics of slavery.' "

by federal courts under the Fourteenth Amendment in cases which involve classifications based on gender. (*Molar* v. *Gates* (1979) 98 Cal.App.3d 1, 12 [159 Cal.Rptr. 239, 12 A.L.R.4th 605].)

In California, which employs the traditional two-tier test of equal protection, distinctions involving "suspect classifications" or classifications that impair "fundamental rights" will be subjected to strict scrutiny by the courts, and the state will be required to bear the heavy burden of showing both that it has a compelling interest which justifies the classification and that the classification is necessary to further that compelling interest. (*Hawkins* v. *Superior Court* (1978) 22 Cal.3d 584, 592 [150 Cal.Rptr. 435, 586 P.2d 916]; *Westbrook* v. *Mihaly* (1970) 2 Cal.3d 765, 784-785 [87 Cal.Rptr. 839, 471 P.2d 487].)

For example, in *Sail'er Inn, Inc.* v. *Kirby* (1971) 5 Cal.3d 1 [95 Cal.Rptr. 329, 485 P.2d 529, 46 A.L.R.3d 351], a woman challenged the constitutionality of a California law prohibiting females from tending bar unless they or their husbands held a liquor license on equal protection grounds. Our Supreme Court applied the strict scrutiny standard of review first, because the statute limited the fundamental right of one class of persons to pursue a lawful profession, and second, "because classifications based upon sex should be treated as suspect." (*Id.*, at p. 17.)

The court then analyzed why classifications based on sex should be subject to the same strict scrutiny that the United States Supreme Court applies in reviewing classifications such as race, lineage or national origin:

"Sex, like race and lineage, is an immutable trait, a status into which the class members are locked by the accident of birth. What differentiates sex from nonsuspect statuses, such as intelligence or physical disability, and aligns it with the recognized suspect classifications is that the characteristic frequently bears no relation to ability to perform or contribute to society. [Citation.] The result is that the whole class is relegated to an inferior legal status without regard to the capabilities or characteristics of its individual members. [Citation.] Where the relation between characteristic and evil to be prevented is so tenuous, courts must look closely at classifications based on that characteristic lest outdated social stereotypes result in invidious laws or practices.

"Another characteristic which underlies all suspect classifications is the stigma of inferiority and second class citizenship associated with them. [Citation.] Women, like Negroes, aliens, and the poor have historically labored under severe legal and social disabilities. Like black citizens, they were, for many years, denied the right to vote and, until recently, the right to serve on juries in many states. They are excluded from or discriminated against in

employment and educational opportunities. Married women in particular have been treated as inferior persons in numerous laws relating to property and independent business ownership and the right to make contracts.

"Laws which disable women from full participation in the political, business and economic arenas are often characterized as 'protective' and beneficial. Those same laws applied to racial or ethnic minorities would readily be recognized as invidious and impermissible. The pedestal upon which women have been placed has all too often, upon closer inspection, been revealed as a cage. We conclude that the sexual classifications are properly treated as suspect, particularly when those classifications are made with respect to a fundamental interest such as employment." (5 Cal.3d pp. 18-20, fns. omitted.)

Since *Sail'er Inn* our Supreme Court has consistently reaffirmed its holding that gender-based differentials are to be treated as "suspect classifications" subject to strict scrutiny. (See, *Arp* v. *Workers Comp. Appeals Bd.* (1977) 19 Cal.3d 395, 400 [138 Cal.Rptr. 293, 563 P.2d 849]; *Hardy* v. *Stumpf* (1978) 21 Cal.3d 1, 7 [145 Cal.Rptr. 176, 576 P.2d 1342].)

In light of *Sail'er Inn*'s pronouncement, no significant difference can be seen between ordering a witness to submit to an attorney's imposition of a "relic of slavery" such as addressing blacks only by their first names, and ordering only female prospective jurors to announce their marital status and husbands' occupations which is likewise a relic of a bygone age when women were presumed incapable of independent thought. Both orders reinforce a stigma of inferiority and second-class citizenship.

Respondent contends that where, as here, no "fundamental interest" is affected, the strict scrutiny test should not be applied. This argument must fail since in both federal and state cases involving classifications other than sex, courts have consistently held that if a classification involves either a suspect classification *or* fundamental interest, strict scrutiny must be applied. (*Molar* v. *Gates, supra,* 98 Cal.App.3d 1, 14 and cases cited therein.)

Respondent's contention that strict scrutiny is inapplicable since appellant was not denied any right to which she was legally or constitutionally entitled is unpersuasive. *Molar* v. *Gates, supra,* 98 Cal.App.3d 1 involved the constitutionality of the policy and practices pursued in Orange County of providing minimum security jail facilities with their attendant privileges, including outside work assignments, for male prisoners while denying such facilities and privileges to female inmates. The trial court ruled that the practice was violative of equal protection and directed issuance of a peremptory writ of mandate commanding the sheriff and board of supervisors to end the discriminatory treatment of female inmates. Utilizing the strict scrutiny test, the court of appeal af-

firmed. The court noted that although the county did not have a legal duty to provide minimum security facilities or outdoor work opportunities (and hence female inmates had no right to such facilities and/or opportunities), the female inmates had a clear right to the enjoyment of the equal protection of the laws and the county had a clear duty to respect that right. (*Id.*, at p. 25; see also, *Inmates of Sybil Brand Inst. for Women* v. *County of Los Angeles* (1982) 130 Cal.App.3d 89, 102 [181 Cal.Rptr. 599] [sex based classification and difference in treatment in transportation to court, access to outdoor recreation areas, and contact visits may only be justified by respondents showing a compelling governmental interest].) Thus, to invoke application of the strict scrutiny standard no right other than the right to equal protection need be asserted.

■ Applying the strict scrutiny standard to the case at bench, respondent does not suggest and we cannot think of any compelling governmental interest for posing one set of questions to female jurors but not to male jurors. Clearly, administrative convenience cannot justify a suspect classification in the face of the strict scrutiny test. (*Inmates of Sybil Brand Inst. for Women* v. *County of Los Angeles, supra,* 130 Cal.App.3d 89, 102.) The fact that counsel was free to ask the men the same questions as were put to the women does not alter the fact that the judge initiated and reinforced the practice of special treatment for female jurors.

Appellant found herself in a situation identical to the one faced by Mary Hamilton some 20 years earlier. Just as Mary Hamilton was justified in disobeying the court's order to respond to discriminatory questioning, so was appellant justified in her refusal to comply with equally discriminatory questioning.

Having reached the above conclusion, it is not needed that we address appellant's contention that her due process rights were violated by respondent's denial of a continuance.

■ The judgment accordingly is reversed.

**KLINE, P. J.**—■ I concur.

Justice Miller has in my view reached the right result for the wrong reason. I think it unnecessary to reach the constitutional issue,[1] for on the unique facts of

---

[1]"A court will not decide a constitutional question unless such construction is absolutely necessary." (*Palermo* v. *Stockton Theatres, Inc.* (1948) 32 Cal.2d 53, 65 [195 P.2d 1], quoting *Estate of Johnson* (1903) 139 Cal. 532, 534 [73 P. 424]; see also *People* v. *Williams* (1976) 16 Cal.3d 663, 667 [128 Cal.Rptr. 888, 547 P.2d 1000], and 13 Cal.Jur.3d, Constitutional Law, § 57, pp. 106-108, and cases there cited.)

this case I would not sustain the judgment even if persuaded the court's questioning were constitutionally valid. Moreover, I believe the most significant issue raised by this case relates more to the proper treatment of jurors than the rights of women.

Our first responsibility is simply to ascertain whether there was sufficient evidence of the jurisdictional facts necessary to sustain the judgment and order. (*In re Buckley* (1973) 10 Cal.3d 237, 247 [110 Cal.Rptr. 121, 514 P.2d 1201], quoting *In re Ciraolo* (1969) 70 Cal.2d 389, 394 [74 Cal.Rptr. 865, 450 P.2d 241]; see also *Arthur* v. *Superior Court* (1965) 62 Cal.2d 404, 409-410 [42 Cal.Rptr. 441, 398 P.2d 777]; and *In re Mason* (1924) 69 Cal.App. 598, 603-605 [232 P. 157].) In making this determination we must keep in mind that the summary contempt power is the ultimate judicial weapon and must therefore be employed with great prudence and caution, lest it be improperly used to stifle freedom of thought and speech. (*In re Buckley, supra*, at p. 249; *Smith* v. *Superior Court* (1968) 68 Cal.2d 547, 560 [68 Cal.Rptr. 1, 440 P.2d 65]; *Lyons* v. *Superior Court* (1955) 43 Cal.2d 755, 762 [278 P.2d 681].) Because a contempt citation is of a criminal nature, "no presumptions of validity may be indulged in support of judgments in contempt, as would be the case with respect to ordinary judgments." (*Freeman* v. *Superior Court* (1955) 44 Cal.2d 533, 536 [282 P.2d 857]; see also *Raiden* v. *Superior Court* (1949) 34 Cal.2d 83, 86 [206 P.2d 1081] and *Martin* v. *Superior Court* (1962) 199 Cal.App.2d 730, 738 [18 Cal.Rptr. 773].)

It is for me supremely relevant to the question whether petitioner's conduct was contemptuous that it occurred while she was being examined as a prospective juror. Unlike all others who appear before the bench, prospective jurors are prospective judges. This fact has critical implications, and not just for those to be judged. As de Tocqueville astutely reminds us, our jury process "instill[s] some of the habits of the judicial mind into every citizen, and just those habits are the very best way of preparing people to be free." (de Tocqueville, Democracy in America (George Lawrence, transl.; J.P. Mayer, edit.; Anchor Books 1969) p. 274.) The American jury, he observed, "should be regarded as a free school which is always open and in which each juror learns his rights, . . . and is given practical lessons in the law . . . ." (*Id.*, at p. 275.) de Tocqueville also discerned that because it represents society "the jury, though seeming to diminish the magistrate's rights, in reality enlarges his sway, and in no other country are judges so powerful as in those where the people have a share in their privileges." (*Id.*, at p. 276; see generally The Jury System in America (Simon edit. 1975).) Elevation of these salutary purposes, which are too easily lost sight of in the day-to-day work of the courts,[2] and the very integrity of the justice system require the willing par-

---

[2]On matters one ex-juror believed too regularly overlooked by trial judges, and the remedial role of the jury with respect thereto, see Chesterton, *The Twelve Men,* in Tremendous Trifles (12th ed. 1930) pages 55-59.

ticipation of our people. If the diverse views that are today commonly and properly represented on a venire in this state are unnecessarily penalized, then, as the Supreme Court pointed out in a different context, those fit for juries "will either shun the burdens of the service or perform it with disquiet and disgust" (*Sinclair* v. *United States* (1929) 279 U.S. 749, 765 [73 L.Ed. 938, 946, 49 S.Ct. 471, 63 A.L.R. 1258]),[3] and trial by capable juries might become an impossibility.[4]

The only phase of trial in which jurors extensively interact with court and counsel is upon voir dire, which means "to speak the truth." Prospective jurors who conscientiously dare to speak and act upon their personal truth must not presumptively be deemed to have behaved improperly. For this reason, and because the refusal of a prospective juror to answer a question may not in all circumstances be inexcusable, this case falls within a class of contempts that should be measured by a higher standard than normally applies.

As stated in *In re Jasper* (1973) 30 Cal.App.3d 985 [106 Cal.Rptr. 754], "[o]rdinarily, a specific wrongful intent is not an essential element in contempt proceedings [citation] and a disavowal of intentional disrespect or wrongful intent is not a defense therein. [Citation.] However, an examination of other cases shows that there exists a class of contempts, where an act is of only doubtful propriety, in which intent does go to the gravamen of the offense and good faith or lack of it on the part of the contemner may determine whether a contempt occurred. [Citations.]" (*Id.,* at p. 988; see also *In re Carrow* (1974) 40 Cal. App.3d 924, 933 [115 Cal.Rptr. 601] and *In re Burns* (1958) 161 Cal. App.2d 137, 141, 143 [326 P.2d 617].) The requirement of specific wrongful intent is indeed a strict one, but the law on contempt is strict, for it is criminal in nature; and the imposition of an essentially criminal penalty for conduct that may represent the conscientious commitment to principle warrants the closest scrutiny.

The central issue in this case, then, is did petitioner possess the specific wrongful intent to impeach or embarrass the court or interrupt its proceedings

---

[3]The conduct condemned in *Sinclair* was the strict and systematic surveillance of jurors by a corps of private detectives procured by the defendant in a criminal case and by others acting at his direction. Such surveillance was held a criminal contempt on the part of its instigators, as it "tended to obstruct the honest and fair administration of justice" (*Sinclair* v. *United States, supra,* 279 U.S. at p. 764 [73 L.Ed. at p. 946]).

[4]Such an unfortunate eventuality is not entirely speculative. An empirical study of prospective jurors in an area of New Jersey "clearly shows that the majority of the citizens selected for jury service did not wish to serve for a variety of reasons." (Richert, *Juror's Attitudes Toward Jury Service* (1977) 2 The Justice System J. 233, 243.) As the author of the study concluded, this finding "undermines . . . the possibility of the jury serving as a major agent of socialization since as a result of their opposition many citizens will not serve as jurors, and those who end up as veniremen may harbor resentment. It is difficult to see how under such circumstances juries may develop participatory attitudes, or feelings of sympathy toward judicial institutions." (*Id.,* at p. 244.)

or, to the contrary, did she act on principle and in good faith? This inquiry most appropriately begins with an analysis of the trial court's order.

Code of Civil Procedure section 1211 provides that for a contempt to be treated summarily "an order must be made, reciting the facts as occurring in [the] immediate view and presence [of the court], adjudging that the person proceeded against is thereby guilty of a contempt, and that he be punished as therein prescribed." (See also *In re Hallinan* (1969) 71 Cal.2d 1179, 1180 [81 Cal.Rptr. 1, 459 P.2d 255].) Compliance with this provision is a jurisdictional requirement, which can be met only if the order summarily punishing a direct contempt "recites facts with sufficient particularity to demonstrate on its face that petitioner's conduct constituted a legal contempt." (*In re Buckley, supra,* 10 Cal.3d at p. 247.)

The sole basis set forth in the order for finding petitioner's behavior contemptuous was that her refusal to answer the question in issue "created an impasse interrupting the course of the proceeding then in progress."[5] The only act or omission relating to the interruption of judicial proceedings statutorily defined as contempt of court and here pertinent is set forth in Code of Civil Procedure section 1209, subdivision 1, as follows: "Disorderly, contemptuous, or insolent behavior toward the judge while holding the court, tending to interrupt the due course of a trial or other judicial proceeding." In other words, it is not the mere interruption that constitutes contempt within the meaning of the statute, but "disorderly, contemptuous or insolent behavior" tending to do so.[6] Admittedly, the list of acts or omissions which may constitute contempt of court set forth in section 1209 is not exclusive, "for the power of a court to punish by contempt an act which impugns its integrity exists independent of statute." (*In re Buckley, supra,* 10 Cal.3d at p. 248, fn. 14.) But the case law definition of contempt also requires an act that " 'tends to impeach, embarrass or obstruct the court in the discharge of its duties.' " (*Lloyd* v. *Superior Court* (1982) 133 Cal.App.3d 896, 900 [184 Cal.Rptr. 467], quoting *In re Shortridge* (1893) 99 Cal. 526, 532 [34 P. 227].) Nowhere in the order appealed from is there any statement regarding petitioner's intent or any indication that her conduct was insolent, rude or disrespectful. The order simply sets forth the conclusory declaration that the interruption caused by the refusal to answer "constituted contemptuous behavior."

---

[5]This bare statement is far less informative than the order of the trial court in *In re Buckley, supra,* 10 Cal.3d at page 245, footnote 10, which also found that the contemnor had interrupted court proceedings but failed to specifically find that the petitioner's statement was made "in a loud, boisterous, insolent or rude manner." (*Id.*, at p. 246.) The Supreme Court remedied this defect by an examination of the record, as we are similarly required to undertake here.

[6]See also Code of Civil Procedure section 1209, subd. 2, which also defines as contempt of court "A breach of the peace, boisterous conduct, or violent disturbance, tending to interrupt the due course of a trial or other judicial proceeding."

Attached to and made a part of the trial court's order is a full transcript of both the portion of the voir dire proceedings at issue and the sentencing hearing. These transcripts not only fail to support the conclusion that petitioner intended to act contumaciously or disrespectfully, but support the *opposite* conclusion, virtually conceded by the trial court, that she acted on principle and in good faith.

The colloquy between the court and petitioner at voir dire, which is set forth in its entirety in Justice Miller's opinion, need not be reiterated. (Though it is relevant to note that the "interruption" this colloquy assertedly represents could not have lasted much longer than a minute and a half.) The statements of the court and petitioner at the sentencing hearing do specifically relate to petitioner's intent. At this hearing petitioner explained her position as follows: "What I was objecting to . . . was the inference . . . that [women] would be influenced by their spouse and the men, on the other hand, . . . wouldn't be influenced by their spouses because you had no questions of any man . . . as to what their spouses did. And, I felt this line drawn between the men and women prospective jurors this morning very, very strongly. And I was hoping I wouldn't be called . . . to the jury box because I knew I would have to object. I had wanted to keep my objections to possibly a letter to you afterwards, but, unfortunately, when my name was called and I had to go forth and answer the questions, I had to decide whether I was going to participate in this or not and I elected not to and I don't feel as a citizen I have to. . . . [¶] . . . I did not come in here to make a statement. I'm not known for my espousal of erratical [*sic*] causes. All I know is it just hurt my gut. And that's why I took the stand I did."

To this and related explanations, the trial judge's response included the following comments: ". . . I think you're honest about that and—that does give me some feelings for this too. If you were a person who just thumbed their nose at authority, just flat because it's authority, then I would see it a different way. But I don't see it in that way with you. I think you're a woman of high principles and an attorney of high principles and that you've done this feeling that, in your own mind, justifiably, that you were going to make a stand and you did make the stand. . . ."

At no time during this hearing was it ever suggested by the trial judge that he considered petitioner's admittedly principled conduct to be insolent or disrespectful. The only explanation provided for finding her in contempt is the following statement of the trial judge: "The refusal to answer questions upon request of the Court, of course, is a contemptuous matter under [Code of Civil Procedure section] 1211. [The intended citation is to § 1209, not § 1211.] You raise no grounds—no reason why you should not answer those quesions—any constitutional reasons that would tend to incriminate you or any such privilege you may have. Consequently, the Court had no alternative but to feel that you

were directly opposed to answer that question by your own will. You just did not want to answer the question. You weren't going to. And that's contemptuous of the Court's power. So, that was the reason for it." When petitioner thereupon restated that she refused to answer because she felt the pattern of questioning was "insulting to all women," the court responded: "I understand your position, as a matter of fact, I agree with your position, and have all along."

In short, not only is there no finding by the court or evidence in the record that petitioner acted in an insolent manner or possessed the specific intent to embarrass the court or interrupt its proceedings, but the trial court specifically acknowledged that petitioner acted on the basis of an articulated principle and did so respectfully and in good faith. On this record I cannot conclude that petitioner's conduct was wilful "in the sense that it is inexcusable," which is an essential element in this class of contempts. (*In re Burns, supra,* 161 Cal. App.2d at p. 141.) The excuse for the failure to respond, as petitioner repeatedly stated at the sentencing hearing, was that her conscience did not permit her to participate in a pattern of questioning she believed "insulting"; a belief the trial court allowed was genuine. The validity of this excuse is not in any way affected by the fact that petitioner is an attorney. Prospective jurors serve only in their capacity as citizens. To enlarge or diminish the rights and duties of a prospective juror according to his or her professional status would be fundamentally inimical to the concept of the jury and have numerous adverse and even dangerous consequences.

The reported cases provide little guidance on the question whether the exercise of conscience provides an acceptable excuse for the refusal of a prospective juror to answer a question upon voir dire.[7] There being no reported case precisely on point, those most analogous to the one before us are cases in which a prospective juror was cited for contempt for refusal to serve.

As will be seen, the dispositions of these cases also turn upon the motive and intent of the potential contemner. In *In re Jenison* (1963) 265 Minn. 96, 97 [120 N.W.2d 515, 516], the defendant refused to serve on the jury on the ground that it was in contravention of a statement in the New Testament, "Judge not, so you will not be judged." The defendant's conviction of contempt was affirmed by the Minnesota Supreme Court, which found it did not offend the state or federal constitutions, and that refusal to serve as a juror was inconsistent

---

[7]Most of the few reported cases in which a prospective juror has been held in contempt of court involve concealment or wilful misstatement of facts upon voir dire and are not here germane. (See, e.g., *Clark* v. *United States* (1933) 289 U.S. 1 [77 L.Ed. 993, 53 S.Ct. 465]; *United States* v. *Henson* (D.D.C. 1959) 179 F.Supp. 474; *United States* v. *Lampkin* (S.D.Fla. 1946) 66 F.Supp. 821; *In re Bassett* (1939) 172 Misc. 613 [15 N.Y.S.2d 737]; *People* v. *Hadesman* (1921) 223 Ill.App. 219; and *Murphy* v. *Wright* (1914) 167 Iowa 75 [148 N.W. 985].)

with the peace and safety of the state. (*Ibid.*) This ruling was vacated by the United States Supreme Court, which remanded the case for further consideration. (*In re Jenison* (1963) 375 U.S. 14 [11 L.Ed.2d 39, 84 S.Ct. 63].) Upon remand the Minnesota high court held there was an inadequate showing that the state's interest required the overriding of the defendant's right of free exercise of her religious belief. In reversing the contempt conviction the court specifically noted that, as in the present case, the contemner demonstrated her sincerity by her willingness to go to jail rather than compromise her conscientious belief.[8] (*In re Jenison, supra,* 267 Minn. 136, 137 [125 N.W.2d 588, 590].)

One of the most celebrated refusal to serve cases is *United States* v. *Hillyard* (E.D.Wash. 1943) 52 F.Supp. 612, which is noteworthy among other reasons because rendered by a trial rather than an appellate court. The defendant in that case, a member of Jehovah's Witnesses, refused to serve for religious reasons. Though the trial judge had no doubt about the defendant's sincerity, the judge felt the defendant's refusal "constituted such a challenge to the authority of the court as to require more formal inquiry and consideration" and had him cited to show cause why he should not be punished for contempt. Concluding that the decided cases provided little or no assistance, the trial judge looked instead to "the history of the times" in which the First Amendment was drafted; specifically the writings of James Madison and Thomas Jefferson. (*United States* v. *Hillyard, supra,* at p. 615.) On this basis the judge felt constrained to dismiss the contempt action. The judge stated that, "[w]hile I cannot understand defendant's reasoning and cannot accept his conclusion, I must admit that his refusal to serve does not amount to a breaking out 'into overt acts against peace and good order.' I have no fear that the prestige of this court will be diminished by this result. Fortunately, in this country the dignity of a court does not depend on its use of its power. Oftentimes a free government can best demonstrate its strength by frugality in its use. Power need not always beget force. Only those who need rely on power must always use it." (*United States* v. *Hillyard, supra,* at p. 615.)

If the contempt power is inappropriate to punish a prospective juror who for reasons of conscience will not serve, it is at least equally inappropriate to punish a prospective juror who for the same reason refuses to answer a particular question.[9]

---

[8]The court conceded the difficulty of ascertaining in particular cases whether a prospective juror was acting sincerely. "Where a juror is a member of a faith which includes as a part of its dogma a prohibition against jury duty, the problem is relatively simple. It becomes more difficult when a personal religious conviction, unrelated to any sectarian creed, is claimed. Suffice it to say that trial courts will have to determine in each instance, with whatever evidence is at hand, whether or not the assertion of a belief which is protected by the First Amendment is in fact a spurious claim." (*In re Jenison* (1963) 267 Minn. 136 at p. 137 [125 N.W.2d at pp. 589-590, 2 A.L.R.3d 1389].)

[9]It is useful to emphasize that because petitioner here was not offended by the substance of the

The use of this drastic remedy in the unique circumstances of the present case was in part unwarranted because other alternatives were available. The most obvious alternative for the trial judge was to accept petitioner's suggestion and put the question in issue to the male prospective jurors, as counsel were sure to do in any case. Acknowledging the validity of petitioner's objection need not have embarrassed the court or undermined its dignity; indeed, it may well have been less embarrassing and more dignified than the course taken. But there were other alternatives also available. If the trial judge believed preservation of judicial dignity precluded concession he could simply have excused petitioner from service in the case. A third alternative was to pass the question objected to and leave its further pursuit to counsel, who probably learned more about petitioner from her refusal to answer than they would from a response.

By ignoring the foregoing and other alternatives and instead holding petitioner in contempt of court, the trial judge might have created a serious problem in the trial of the case then before him. The severe punishment[10] imposed upon petitioner for acting upon the widely shared belief that women should be treated no differently than men may well have offended other members of the venire.[11] Such antipathies could, during trial, have induced some members of the jury to ignore evidentiary and other rulings by the court, thereby impairing the right of the litigants to a fair trial. While the record before us sheds no light on this matter, and the possibility that the court's action adversely infected the venire is admittedly speculative, the possibility exists nonetheless and provides additional reason for prudence in the use of the contempt power against a prospective juror.[12]

I am mindful that in the removed atmosphere of the appellate courts it is too easy to minimize the exigencies that regularly confront the trial courts. It is not my purpose to do so here; nor certainly to suggest that under no circumstances

---

question, and was willing to answer if the same question were put to all members of the venire, this case does not present any issue relating to the right to privacy. On the right to privacy of prospective jurors on voir dire see *United States* v. *Barnes* (2d Cir. 1979) 604 F.2d 121 and *Lehman* v. *City and County of San Francisco* (1978) 80 Cal.App.3d 309 [145 Cal.Rptr.493]; see also Comment, *The Right to Privacy of Prospective Jurors During Voir Dire* (1982) 70 Cal.L.Rev. 708, and Comment, *Voir Dire Limitations as a Means of Protecting Jurors' Safety and Privacy: United States* v. *Barnes* (1980) 93 Harv.L.Rev. 782.

[10]After holding petitioner in contempt, and in the presence of the entire venire, the trial court ordered the bailiff to immediately place petitioner in custody.

[11]For empirical evidence of adverse juror reaction to sexually discriminatory questions of women on voir dire, see Broeder, *Voir Dire Examinations: An Empirical Study* (1965) 38 So.Cal.L.Rev. 503, 527.

[12]The nature of the interaction between members of the venire and the court during voir dire can be critical because "[h]ow jurors perceive their judge's perception of them affects their morale and will." (Kerig, *Perceptions From a Jury Box* (1979) 54 State Bar J. 306, 313. See also *Voir Dire Examinations: An Empirical Study, supra,* at p. 505.)

may a recalcitrant member of a venire properly be held in contempt of court. My decision is strictly and very narrowly limited to the uncommon situation in which a prospective juror, acting upon moral principle, is conscientiously and in good faith unwilling to fully participate in voir dire for an articulated reason rationally related to the asserted principle and does so in a respectful manner. Acts such as these, which when committed by a prospective juror are not in all instances manifestly improper, are within that special class of contempts in which wrongful intent is essential to the offense and good faith may excuse what might otherwise properly be considered contemptuous conduct. (*In re Jasper, supra,* 30 Cal.App.3d at p. 988.) The latitude granted prospective jurors by this rule is warranted by the nature of their role; it does not deprive the courts of any power essential to our function. It is well to remember, in this connection, that as reiterated by the United States Supreme Court in *In re Little* (1972) 404 U.S. 553, 555 [30 L.Ed.2d 708, 711, 92 S.Ct. 659], " '[T]he law of contempt is not made for the protection of judges who may be sensitive . . . . Judges are supposed to be men [and women] of fortitude, able to thrive in a hardy climate.' *Craig* v. *Harney,* 331 U.S. 367, 376 (1947). 'Trial courts . . . must be on guard against confusing offenses to their sensibilities with obstruction to the administration of justice.' *Brown* v. *United States,* 356 U.S. 148, 153 (1958)."

Because petitioner was a prospective juror and the record demonstrates she acted during voir dire on the basis of a moral principle asserted respectfully and in good faith, I concur in the judgment setting aside the judgment of contempt.

**ROUSE, J.**—I respectfully dissent.

At oral argument, counsel for appellant conceded that, if the questions were proper, then she would not challenge the trial judge's right to hold that appellant's refusal to answer was an act of contempt. Therefore, in my view, the only issue before this court is whether appellant had the right to refuse to answer the questions "Do you have a husband?" and "What is [his] occupation?"

I cannot accept appellant's assertion that her refusal to answer such innocuous questions is a matter of constitutional dimension. Both as a trial lawyer and a trial judge, I have asked similar questions of prospective jurors on many occasions, blissfully unaware of the sinister nature of the inference now ascribed to them by appellant. Clearly, it is a proper area of inquiry, generally addressed to both male and female members of a venire, but, until I read Justice Miller's opinion, I was unaware of any requirement that such questions be put to each or to none. It seems to me that the matter of one's marital status and occupation is a common subject of inquiry and discussion at any gathering of two or more persons, in a variety of settings, including (but certainly not confined

to) social affairs, various agencies in the private and public sectors, and even in the courtroom.

The *Hamilton* case, relied upon by Justice Miller in his opinion (i.e., *Hamilton* v. *Alabama* (1964) 376 U.S. 650 [11 L.Ed.2d 979, 84 S.Ct. 982]) is readily distinguishable from the facts of this case. There the court's behavior toward Mrs. Hamilton was personally demeaning with racial overtones. Here, there was nothing demeaning to appellant, either in the questions themselves or in the manner in which they were asked.

Appellant does not claim an invasion of her privacy, which would, of course, present an entirely different situation. Instead, by her responses to the judge's inquiry, she was, in my view, telling him, apparently in a courteous, but nonetheless defiant, manner, that she did not approve of the way in which he conducted his court. No one would challenge her right to do this, in more appropriate circumstances. However, this was neither the time nor the place for such an admonition. We don't know from the record how many members of the prospective venire were then present in the courtroom, nor do we know how many prospective jurors had already been asked the questions which have provoked this controversy. From appellant's responses it may be assumed that there were other women who had been asked, and men who were not.

Even though appellant's attendance on this occasion was that of a prospective juror, the fact that she was an attorney is, in my judgment, a significant feature of this scenario. How was this act of defiance by an officer of the court viewed by the laypersons present? The presiding officer's authority was challenged —the gauntlet hurled in his face—how must he respond? By excusing her without further admonition or sanction, thereby creating an impression that, by refusing to answer questions, one can avoid jury duty? By a personal admonition at a later time in the privacy of the judge's chambers, thereby lending credence to the belief that lawyers enjoy a special privilege of access to the judge—one which is not generally enjoyed by nonlawyers (often inaccurately characterized as "the old school tie" relationship)?

While the 15 minutes of custodial detention, which was imposed as a sanction, was somewhat severe in this instance (a minimal fine, *suspended,* might well have served the purpose), nevertheless this was more properly a matter for the trial court's determination.

In *United States* v. *Cantillon* (C.D.Cal. 1970) 309 F.Supp. 700, the court pointed out that the failure to answer, in order to constitute a contempt by obstructing justice, would necessarily require a disruption of the court's judicial business. Assuming a disruption of judicial business, to sustain a conviction the proof would have to establish that a defendant's failure to answer caused a

disruption of judicial business and that defendant's failure to answer was not because of lack of understanding, but because of a deliberate refusal to answer. Of course, proof would undoubtedly be required to show that a defendant was aware of his duty to answer and his refusal constituted a defiance of the court. Furthermore, it is doubtful if a conviction could be sustained in the absence of an order by the court to a defendant to answer. (*United States* v. *Cantillon, supra,* at p. 703.)

In my opinion, all of the requisite elements were present in this case. The trial judge had no reasonable alternative available to him in these circumstances. More than once during their not unfriendly exchange he reminded appellant of her responsibility, as an attorney, to the court and that refusal to respond would constitute contempt. He then repeated the now famous (or infamous) question to which she replied, "I refuse to answer."

Obviously, appellant views this matter as a manifestation of sexual bias and one of constitutional magnitude. She has successfully persuaded one of my colleagues on that point. Unfortunately, I cannot agree with either of my colleague's resolution of the matter.

I would affirm the judgment.

The petition of defendant and respondent for a hearing by the Supreme Court was denied August 11, 1983. Grodin, J., did not participate therein.