[Crim. No. 11813. First Dist., Div. Three. July 25, 1974.]

In re ROBERT D. CARROW on Habeas Corpus.

## COUNSEL

Tuckman, Goldstein & Phillips, Alvin H. Goldstein, Jr., and Anthony C. Duffy for Petitioner.

Levy & Van Bourg, Victor J. Van Bourg, Stewart Weinberg, Garry, Drey-fus, McTernan & Brotsky, Benjamin Dreyfus and Dennis Roberts as Amici Curiae on behalf of Petitioner.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Robert R. Granucci and Herbert F. Wilkinson, Deputy Attorneys General, for Respondent.

## OPINION

**DEVINE, J.**\*—Robert D. Carrow, lawyer, was found guilty of contempt of court committed during the trial in which he represented Ruchel Magee. Two incidents of contempt were charged. On each petitioner was fined $500 and sentenced to five days in the county jail, the sentences to run consecutively. He seeks annulment by petition for habeas corpus. The Supreme Court has issued an order to show cause why the writ should not be granted, and has directed us to consider the matter in the light of *In re Buckley,* 10 Cal.3d 237 [110 Cal.Rptr. 121, 514 P.2d 1201].

A just disposition cannot be made without an understanding, if not compassionate, consideration of the almost unbearable pressure the trial brought upon judge and counsel. It is unnecessary, because the trial drew national attention, to say more about its general character, than that it concerned charges of murder of a distinguished judge and of other persons, assault by gunfire upon a deputy district attorney, and of kidnaping for purposes of extortion; that by the time of the first episode of alleged contempt, the trial had been going on for six weeks; that extraordinary security measures were taken; that defendant constantly expressed his wish to represent himself; and that during the trial he spat on Mr. Carrow, struck him, spoke to the spectators asking that someone get a gun and kill his lawyer. Besides, as was made known to the court by declaration under penalty of perjury, Mr. Carrow was beset with personal problems during the trial: he suffered from gastric ulcers; his family had been threatened with harm; he had tried to withdraw from the case, but had been refused; his father had died unexpectedly, and he had been prevented from despatching attendant family affairs. (No reference to this declaration is made in the order of contempt; presumably it was deemed insufficient to excuse the conduct, even when accompanied by the apology referred to below.)

\*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

It is necessary to discuss at this point petitioner's contention that the judge had become so "embroiled" in controversy with petitioner that he was obliged to recuse himself and to refer the matter to another judge. In respect of some 11 instances of asserted impatience or petulance on the part of the judge in dealing with counsel, at other times than those of the crucial episodes, we find nothing of a particularly personal nature. The incidents are of not uncommon kind, particularly in a long and exasperating trial: and in some, counsel was guilty of time consuming conduct. In the matter of "embroilment" in the two episodes, we find again none of the personal involvement which would require recusal. The remarks made by counsel, as described below, even considered in the most unfavorable light, do not approach the insulting charge, made in *In re Buckley*, which directly impugned the integrity of the judge, by charging him with unwillingness to apply the law; but even that affront, it was held, did not constitute such "fighting words" (as were the epithets hurled in *Mayberry* v. *Pennsylvania*, 400 U.S. 455, 465-466 [27 L.Ed.2d 532, 540-541, 91 S.Ct. 499]) as to make the judge unfit to pass on the matter of contempt. Whether the fact that the judge postponed the adjudication until the end of the trial (showing that immediate punishment was not necessary for orderly progress of the trial) compelled referring the matter to another judge, or would merely have been better procedure, as was said in *Mayberry*, we need not decide because of our conclusion on the merits.

The very absence of strictly personal insult which negatives necessary "embroilment" minimizes the thrust of the lawyer's remarks, which we proceed to analyze in some detail. Because of the step-by-step examination, it will best suit the reading if we announce here our conclusion, which is that, even giving to the adjudication the benefit of the substantial evidence rule, as we are bound to do (*In re Buckley*, 10 Cal.3d 237, 247 [110 Cal. Rptr. 121, 514 P.2d 1201]; *In re Ciraolo*, 70 Cal.2d 389, 394 [74 Cal. Rptr. 865, 450 P.2d 241]), we cannot sustain the order of contempt.

### The First Episode

The remark which the court found offensive was: "Your Honor, I submit this trial is becoming a joke." That the remark was ill-chosen is virtually conceded; but unfortunate statements do not necessarily call for imprisonment. Surely contempt must be dealt with firmly lest the judicial process fall into disrepute. But the remark herein, unlike that in *Buckley* (and in the several cases cited therein at p. 248), "a charge of deliberate judicial dishonesty" (10 Cal.3d at p. 250), is not contemptuous on its face, because in itself it does not refer to judicial conduct, much less to judicial

nefariousness. Indeed, it commences with the respectful salutation, "Your Honor," and with the deferential words, "I submit." Thereafter, the words refer to an *objective* matter: that the trial (this could be by the action of someone or by several persons or by inaction or by accident) had become, perhaps momentarily, ludicrous. (Ironically, trials have been judicially termed a "farce," so far as we know, only when an advocate has failed to perform his obligation of firm and intelligent advocacy, e.g., *People* v. *Ibarra,* 60 Cal.2d 460, 466 [34 Cal.Rptr. 863, 386 P.2d 487].)

Moreover, the judge did not declare in the order, as did the judge in *Buckley* (even though the remark there was held contemptuous on its face) that the statement made an accusation, specifying its nature, against the judge. The order adjudging contempt does contain the conclusionary words that the utterance held the court up to ridicule and scorn. But how? What does the order describe as an imputation of malfeasance or nonfeasance on the part of the judge? Nothing; and in this we find it defective, because "such an order is valid only if it recites facts with sufficient particularity to demonstrate on its face that petitioner's conduct constituted a legal contempt." (*In re Buckley, supra,* 10 Cal.3d at p. 247.) Particularly is the order deficient in the context in which the remark was made, which is relevant in the matter of intent. (*In re Buckley, supra,* at p. 246, fn. 12.) We proceed to describe the circumstances.

At the beginning, we observe that the admittedly faulty remark was not preceded by any utterance of a disrespectful character, unlike the situation in the *Buckley* case, in which the offending remark appears to have been the climax to several prior impertinent remarks by Buckley to the judge. (10 Cal.3d at p. 250, fn. 16.) The situation was this: petitioner had called as witness a probation officer to testify to certain observations he had made at the scene and, understandably, he was concerned to limit the cross-examination to the scope of the direct. The passage leading to the assertedly contemptuous remark begins with the prosecutor's expressing doubt that he could pursue the inquiry along a certain line; but he proceeded, tentatively. Petitioner then asked the court, respectfully, for permission to address the court on the subject of the limits of the "scope" or "scopes" of permissible cross-examination. (Different physical areas of the scene were the subject of the question.) The judge replied, "one more word out of you and there are going to be problems," and that he would hear the matter outside the presence of the jury. But this promised procedure was not followed. The prosecutor then asked a question which he later conceded was too general; the witness, who was very "forceful and articulate," speaking "awfully fast" (as the prosecutor admitted) ran away with a narrative which (again, by the prosecutor's honest admission) "was going a little too far"

and "covered quite a lot of ground." During the witness' hurried flow, the prosecutor actually waved at him to cease (here again, the prosecutor forthrightly later said so to the judge). Then came the single expostulation from petitioner. It may have been directed primarily at the witness and only secondarily, if at all, at the judge. No ruling of the latter was challenged. It was the turn of events (brought about unwittingly by the judge's failure to take the matter up in the jury's absence, coupled with the silencing of counsel), apparently, which exasperated counsel.

But whatever may have been the erroneous or ambiguous or hyperbolic or disrespectful utterance, it was subject to easy and rapid correction. And counsel asked the judge, "Might I be heard?" six times before he was able to explain. The difficulty, it developed, was this: counsel believed he had been silenced (a reasonable conclusion) by the court's "one more word out of you" warning; this permitted the flood of words from the witness. The judge was of the view that objection on the ground that the testimony was narrative should have been made, and said it would have been sustained. But a request, such as counsel had made, for a prospective ruling might have served well where such a subject as "scope" was concerned, in order to avoid repetitive objections. The court had recognized this, in its announcement of the expected conference in the jury's absence.

Plainly, after the event an announcement or explanation in the presence of the jury would have restored whatever dignity the court had lost. If ridicule and scorn had been visited upon the court, or were about to be, this was the time for insistence upon reparation. But no suggestion to this effect was made, probably because the judge did *not* adjudicate contempt at the time of the hearing immediately following the incident; in fact, the hearing ended with an invitation to counsel to read the transcript and to move to strike narrative portions of the testimony. No invitation to apologize was even suggested. It was not until the end of the trial, more than two months later, that the subject was taken up again. The time for formal repair in the jury's presence was long gone.

This brings us to the declaration, in the order of contempt, that counsel's conduct "interfered with the orderly procedures of the Court and impeded the orderly administration of justice." This is inadequate. Although the *Buckley* opinion states that physical obstruction to the administration of justice is not necessary in order to constitute contempt (10 Cal.3d at p. 254, fn. 22), it recognizes that, under *In re Little,* 404 U.S. 553, 555 [30 L.Ed.2d 708, 711, 92 S.Ct. 659], the conduct, in order to fall within this category of contempt, "must result in ' "an imminent, not merely a likely, threat to the administration of justice." ' " Following the brief argument

in the jury's absence, the trial resumed. The witness was excused. Another witness appeared. The matter of striking the narrative testimony was deferred. No reference was made to the untowards incident. No obstruction of justice appears from the record, and none is described, save in conclusionary terms, in the order.

Finally, there is the recitation in the order that the words were spoken in "an insolent, rude, and disrespectful manner." But, the remark having been an isolated one, there was no prior warning, which is necessary in order to sustain this factor. (*In re Hallinan,* 71 Cal.2d 1179, 1181-1182 [81 Cal. Rptr. 1, 459 P.2d 255]; *Gallagher* v. *Municipal Court,* 31 Cal.2d 784, 797 [192 P.2d 905].) Moreover, this finding was made, over petitioner's denial, more than two months after the event.

The adjudication of the contempt must be annulled.

### The Second Episode

■ This occurred during petitioner's argument to the jury. Reference to punishment in event of conviction was made. It is important to review the unusual, almost incredible, situation which existed in respect of penalty. Magee was charged with murder. The death penalty having been declared unconstitutional, the heaviest penalty for murder, assuming a first degree conviction, would be life imprisonment, but this would be with possibility of parole. Magee was also charged with kidnaping for the purpose of extortion, in violation of Penal Code section 209, during which offense persons had suffered bodily harm. This called for life imprisonment without possibility of parole. (The charged extortion apparently was an asserted demand upon the officers to refrain from resisting the kidnaping, escape and assault then taking place.)[1] Thus, if the jury were to acquit Magee of murder, but to convict him of violation of section 209, he would have to face a heavier punishment than he would if he were convicted of what is generally considered the ultimate crime, murder. Petitioner argued to the jury that although his client was properly *chargeable* with murder, the prosecution had *"overcharged"* him with section 209 under a strained interpretation of that section, instead of with more specific statutes relating to forcible escape, even as commenced outside the prison walls, Penal Code sections 4503 and 4504.

Counsel's argument (and the court recognized its general validity as argu-

---

[1] See *Magee* v. *Superior Court,* 34 Cal.App.3d 201, 219, 220 [109 Cal.Rptr. 758]. (Actually, the jury was unable to arrive at a verdict on any count.)

ment) boldly took the course that, particularly because a deputy district attorney had been injured severely in the tragic episode, the district attorney, acting in a discriminatory manner, had obtained indictment on section 209, then the greatest offense, in terms of punishment, rather than on the suitable escape charges (§ 4503 provides for life imprisonment, but with possibility of parole). During the course of the argument, there are these passages:

"[MR. CARROW]: These charges [§ 4503], which reasonably fit the facts, are considered. They are not heavy enough. So instead, the District Attorney of Marin County, Bruce Bales, sought and obtained an indictment' for kidnapping for purpose of extortion. I will comment more on that further, the strange interpretation that that requires. And for murder, the second Count, murder, no quarrel with that. If Mr. Magee murdered somebody, Mr. Magee should be tried for that.

"My concern at this point is the first Count, Section 209 of the Penal Code, kidnapping for purpose of extortion. Life in prison without possibility of parole.

"THE COURT: Just a moment. That remark is stricken and the jury is admonished to disregard it.

"Counsel, you know better than that. Punishment is not to be considered by the jury for any purpose whatsoever.

"MR. CARROW: I apologize.

"THE COURT: And the jury is admonished to disregard it.

"Counsel, don't do it again."

And shortly thereafter:

"[MR. CARROW]: The Marin County District Attorney's office took a totally inapplicable Penal Code provision and charged Mr. Magee on it, Section 209, in an effort to saddle Mr. Magee with the greatest punishment possible.

"THE COURT: Just one moment.

"Counsel, I will cite you for misconduct. I have told you before, punishment is not to be considered and the jury is so instructed. Your remark is stricken from the record and the jury is admonished to disregard it as if it were never spoken.

"MR. CARROW: May I address myself on that point, Your Honor?

"THE COURT: Just one moment. You may not address the Court. The

Court will allow, in its discretion, Counsel to discuss pertinent and applicable interpretations of the law.

"The Court will give the law and the jury will follow the law as is its duty.

"Now, Counsel, you will confine yourself to accurate—

"MR. CARROW: Is it the Court's position that I can not address myself to the purpose and reason behind this indictment?

"THE COURT: Counsel, you may address yourself to the evidence in this case and draw any inferences that you think are properly drawn from the evidence in this case.

"Now, that is the ruling of the Court. And confine yourself to those comments."[2]

It is arguable, though we do not now hold, that reference could be made to the prohibition of parole even without the "discriminatory action" theory. For although the jury should not be concerned with punishment when the court and the Adult Authority are vested with discretion, there is no such discretion in the case of violation of section 209 (and, so far as comes to mind, there is only one other offense, violation of Penal Code section 219, trainwrecking, which calls for life punishment, with utter denial of further judicial or quasi-judicial authority). But the defense theory here was not that the jury should not convict even if they were convinced of guilt of the charge,[3] but that they should consider that the charge had been made upon forced construction of the law for special and personal reasons. In fact, the judge said in chambers, following the incident, that it would have been proper to refer to the penalty as "heavier" (presumably than those attached to § 4503 and to murder), but not the "heaviest."[4] But this refinement is tenuous; and it conflicts with the conclusion which one must infer from the court's declaration in the order of contempt that counsel had been informed that the jury was to be instructed not to discuss penalty—the conclusion being that *any* reference to penalty (whether "greatest" or "heavier") would be misconduct.[5]

---

[2]Shortly thereafter, the court, in chambers, cited counsel and adjudged him guilty of contempt and rendered sentence, but following argument, vacated the order. The judge made a new order and sentence about 40 days later.

[3]Petitioner had said to the jury: "And for murder, the second Count, murder, no quarrel with that. If Mr. Magee murdered somebody, Mr. Magee should be tried for that"; and again, "If Mr. Magee committed a crime, Mr. Magee should pay for that crime."

[4]The word actually used by counsel was "greatest."

[5]The "overcharging" argument and its relation to referring to penalty during the course of argument must be limited to such a case as this, where there is an unusual

The court further found that the remark was made in bad faith. This conclusionary declaration is insufficient. Petitioner had made it plain, both in colloquy in chambers following the citing for misconduct and in his declaration in defense against the contempt charge, that he had understood that the matter of penalty could be referred to for the limited purpose told above, and that his comment was within the permissible limit. It would be necessary for the court specifically to find on this matter—for example, to state that petitioner *did* understand that reference to *greatest* possible punishment had been proscribed by the court's ruling. This is a strict requirement, but the law on contempt is strict, for it is criminal in nature (*Butler* v. *Superior Court,* 178 Cal.App.2d 763, 765 [3 Cal.Rptr. 180]; *Mattos* v. *Superior Court,* 30 Cal.App.2d 641, 646 [86 P.2d 1056]), and specific intent to act contumaciously is required in cases where an act is of only doubtful propriety (*In re Jasper,* 30 Cal.App.3d 985, 988 [106 Cal.Rptr. 754]; *In re Burns,* 161 Cal.App.2d 137, 141, 143 [326 P.2d 617]).

A word should be said about the apology offered to the trial judge by petitioner. In form, it appears to be a sincere expression of regret if, in any way, petitioner's conduct had been offensive. Not only is it so in the tenor of its expression, as one reads it, but besides, the judge made no finding or comment to the effect that it was insincere or that, as in *In re Buckley* (10 Cal.3d at p. 244), the apology actually exacerbated the affront, or that in any other respect it was unworthy of acceptance. (We cannot agree with the Attorney General's statement that the apology did not truly express contrition because it contained no explanation. The explanations had already been given and had been rejected. To express regret was the only remedial thing left for petitioner to do, and this he did.) We do not reach our decision because of the court's declining to accept the apology, or because of the lack of stated reasons for its rejection. The effect to be given to such a mitigating factor as apology lies in the sound discretion of the trial judge. (*In re Buckley, supra,* at p. 257.) But because of the favor with which the courts regard an apology (*Lyons* v. *Superior Court,* 43 Cal.2d 755, 762-763 [278 P.2d 681]; *In re Hallinan,* 71 Cal.2d 1179, 1181 [81 Cal.Rptr. 1, 459 P.2d 255]), and from the beginning have regarded it (*People* v. *Turner,* 1 Cal. 152, 153), we come to our decision with the more equanimity, believing that for whatever slight to the court was made, substantial reparation was offered.

We do not intend to rebuke the judge. When he made the adjudication,

contrast of statutes and unique circumstances. The door must not be opened to reference to penalty in other cases by too free accusation of discriminatory conduct by the prosecution.

he was emerging from an exhausting and turbulent trial. But because of the absence of clear evidence and precise findings of affront to the court, the order of contempt cannot be sustained.

The order adjudging petitioner guilty of contempt of court is annulled.

Draper, P. J., and Brown (H. C.), J., concurred.